## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| LINDA C. RICHARDSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 06-0167-BH-B |
| ALABAMA PINE PULP COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

### FINDINGS OF FACT; CONCLUSIONS OF LAW
### AND ORDER

This action is before the Court on defendant's motion for summary judgment (Docs. 13-14). Upon consideration of the motion, plaintiff's response in opposition thereto (Doc. 17), defendant's reply (Doc. 19), and all other pertinent portions of the record, the Court concludes that the motion is due to be granted.

### FINDINGS OF FACT

Upon consideration of all the evidence of record, both testimonial and documentary, the Court finds that the following facts are either undisputed or uncontradicted by the plaintiff:

1. The plaintiff, Linda C. Richardson ("Richardson"), was first hired by Alabama Pine Pulp Company, Inc. ("APPC") in May 1991. (Richardson Dep.at 26.) According to Richardson, the only job available at that time was "very strenuous." (*Id*. at 27.) After a short time, Richardson quit because of strenuous working conditions. (*Id*. 51-52.)

2. A few months later, Richardson returned to work for APPC in the storeroom area. (Richardson Dep. at 28.) Robert Vann, in the human resources department, rehired Richardson even though she had quit her previous job with APPC. (*Id*. at 51-52.)

3. In 1996 or 1997, Richardson was promoted to the position of Control Tester, responsible for performing pulp quality testing, and held that position for the duration of her employment with APPC. (Richardson Dep. at 30.) As a Control Tester, Richardson's duties included collecting pulp samples, monitoring pulp production, and testing pulp quality. (*Id*. at 30-32.) Richardson was responsible for ensuring that the pulp ordered by APPC's customers would meet the specifications of the end user. (*Id*. at 33-34.) Richardson understands the importance of the end user's satisfaction with APPC's product and appreciates the potential ramifications for APPC if a product does not meet the end user's specifications. (*Id*. at 33-34.)

4. During her employment, Richardson received several counselings, written and oral, for performance issues, attendance policy violations, and sleeping in the company's restroom. (Richardson Dep. at 52-61; 99-100.) Richardson does not deny this but, rather, argues without evidentiary support that "[n]othing she did between 2003 and her ultimate termination violated APPC policies or the traditional practices of the company" and that such was simply "a campaign to force her out of the company." (Plaintiff's Opposition Brief at 3.)

5.      In or about January 2004, APPC received a customer complaint about an order for which Richardson had been responsible for testing, evaluating, and ensuring quality control. (Richardson Dep. at 65.)  This customer complaint and the efforts to investigate and remedy it ultimately cost APPC more than a half million dollars. (*Id*. at 65-66; Vann Aff. at ¶ 6.)  Richardson does not dispute either the complaint or the cost incurred by the company to investigate and rectify same.

6.      Richardson was not terminated for her half million dollar error; instead, she was reprimanded, suspended for fourteen days, and asked to prepare a personal improvement plan. (Richardson Dep. at 66-69 and Exh.12.)  Richardson also received and signed a "Last Chance Agreement." (*Id*. at 68-69 and Exh. 13.)

7.      In February 2004, Richardson's department supervisor advised his employees, including Richardson, of APPC's policy concerning phone usage. (Richardson Dep. at 76 and Exh.15.)  Specifically, all employees were informed that personal calls should not exceed ten minutes per shift and advised that APPC would monitor phone records to ensure compliance with this time limit. (*Id*. at 75-76 and Exh. 15.)  In April 2004, during the time period that Richardson was supposed to be improving her work ethic and performance, and just weeks after she was advised of the policy concerning phone use, Richardson spent nearly three hours of one shift on personal phone calls. (*Id.* at 78 and Exh. 16.)  Richardson does not deny this infraction but, instead, argues without evidentiary support: (1) that her punishment was more severe than that given to unidentified "Caucasians" who allegedly viewed pornography on the

company computer at some unidentified time; and (2) "Richardson's understanding of the memo issued by Steve Green regarding telephone calls [was] that there were exceptions to the ten minute guideline [and] she believed [she] fit those exceptions." (Plaintiff's Opposition Brief at 4.)[1]

8. Richardson was not terminated for violating her Last Chance Agreement and spending nearly three hours on personal calls; instead, in response to Richardson's pleas for leniency due to her marital and family circumstances, Richardson was given a "Second Last Chance Agreement" and suspended for thirty days. (Richardson Dep. at 80-81 and Exh. 16.)

9. No other employee has ever been offered a "Second Last Chance Agreement." (Vann Aff. ¶ 25.) Richardson does not dispute that she is the only employee to ever be offered such a "Second Last Chance Agreement."

10. After receiving her Second Last Chance Agreement, Richardson was counseled for showing up late for work, calling the payroll clerk at home on the weekend to interrogate her about a bonus check (questions concerning compensation should be

---

[1]Richardson also argues that "Jill Hollinsmorth was on the telephone for more than an hour during her shift" and, although Hollinsworth was reprimanded for excessive phone use, she was never suspended or terminated for such violation. (Plaintiff's Opposition Brief at 4.) Richardson's argument only references her Exhibit 3, the affidavit of Paulette Williams, which does not make any such assertion regarding Jill Hollinsworth. Even if Richardson intended to reference instead the affidavit of Virginia Flowers, such reference is still inappropriate inasmuch as Flowers merely states that "Jill Hollinsworth spends a lot of time on the telephone and on the internet, sometimes for over an hour at one time." Flowers Aff. at ¶ 15. Neither Richardson, Williams nor Flowers has established a time frame for the alleged violation by Hollinsworth of the company phone policy.

directed to the department supervisor not the payroll clerk who handles checks for 500 employees), and failing to provide hourly reports to the pulp bleaching department as required. (Binion Aff. at ¶¶ 6-8.)  Richardson does not dispute that she was late for work on the day at issue.  Instead, Richardson essentially argues that she was entitled to go directly to the first aid station for a required hearing test even though it was 5:00 a.m. and the first aid station did not open until 6:00 a.m. and thus that she was entitled to sit waiting for one hour instead of reporting to work and finding someone to cover for her when the first aid station opened and her hearing could be tested.  Richardson's reliance on the affidavit testimony of Virginia Flowers is misguided.  Although Flowers indeed states without proper evidentiary support that "[f]or years we were told if we walk through the mill to our work station before getting our hearing checked, we could not have our hearing checked due to exposure to extreme loud noise levels," she then contradicts herself by acknowledging that Steve Donald left his work station to drive to the first aid station for his hearing test and that, although Lavaughn Fendley went to the first aid station for his hearing test prior to reporting to his work station, he did so at 7:00 a.m., not prior to its 6:00 a.m. opening.  (Flowers Aff. at ¶¶ 7-8.)  Although Richardson takes issue with the inappropriateness of calling the payroll clerk at her home (Plaintiff's Opposition Brief at 5), she does not dispute that she failed to provide hourly reports to the pulp bleaching department as required.

   11. On January 20, 2005, Richardson sent APPC a faxed note from Judson Menefee, M.D., requesting that Richardson be excused from work until January 31 for

"medical reasons." (Richardson Dep. at 100-109; Vann Aff. ¶ 14; Binion Aff. ¶ 10.) Upon receiving the note, James Binion, Richardson's supervisor, called Richardson to ask why she needed leave. (*Id.* at 109-110.) Richardson told Binion that she had an active thyroid and hypertension. (*Id.* at 110.) Richardson failed to explain how these conditions precluded her from working. (Binion Aff. ¶ 10.)

12. The following day, January 21, 2005, APPC attempted to contact Richardson at home, presuming that she would be at home if she were too ill to work, and was told by Richardson's husband that she had driven to Mobile. (Vann Aff. ¶15; Binion Aff. ¶ 11; Richardson Dep. at 111.) APPC then called Richardson's cell phone and left a message. (Binion Aff. ¶ 11.) Later that day, Richardson called Binion. (Richardson Dep. at 113-14.) According to Richardson, Binion told her that APPC needed more than a faxed note saying she needed leave for unspecified "medical reasons." (*Id.* at 115.) Binion advised Richardson that her leave issue "was out of his and Steve's hands" and told Richardson that she "needed to talk to personnel because they [Binion and Green] no longer had anything to do with it." (*Id.* at 115.) Richardson agreed to call Dr. Menefee and ask him to speak with APPC. (*Id.* at 114.)

13. Dr. Menefee subsequently called John Newton, in APPC's human resources department, and left a message for Newton to return his call. (Newton Aff. at ¶ 4.) Newton, along with Johnson and Vann, called Dr. Menefee and explained Richardson's job duties. (Newton Aff. ¶ 4; Vann Aff. ¶ 17.) Newton also mentioned to Dr. Menefee that Richardson was not at home and had driven to Mobile. (Newton Aff. ¶ 4.) Dr.

Menefee informed Mr. Newton that given Richardson's job duties and apparent ability to travel, she could have worked and did not need leave. (Newton Aff. ¶ 4.)

14. After speaking with Dr. Menefee, APPC contacted Richardson to set up a meeting to discuss her request for medical leave; specifically, what condition precluded her from working given that Dr. Menefee had indicated to APPC that she could perform the duties of her job. (Vann Aff. ¶ 18; Newton Aff. ¶ 5; Binion Aff. ¶ 14.) Richardson agreed to report to APPC on January 24 to discuss her request for leave and provide additional information. (Newton Aff. ¶ 5; Vann Aff. ¶ 18; Binion Aff. ¶ 14; Richardson Dep. at 116.)

15. On the morning of January 24, 2005, Richardson left a voice mail message, stating that she would not be able to attend the scheduled meeting. (Richardson Dep. at 117; Vann Aff. ¶ 19.)

16. On the afternoon of January 24, Richardson called Newton to confirm that her voice mail message had been received, and that he understood she needed to cancel the meeting. (Richardson Dep. at 125; Newton Aff. ¶ 6.)

17. Although Richardson indisputably knew that APPC had questions about her request for leave, from January 24 until February 1, 2005, Richardson did not contact APPC, provide further documentation to support her leave request, or attempt to reschedule the meeting that she cancelled on January 24, 2005. (Binion Aff. ¶ 16; Vann Aff. ¶ 20; Newton Aff. ¶ 1; Richardson Dep. at 126 (noting that she "knew they were on

me about one week of sick leave"); 129.)  APPC attempted to contact Richardson at home and on her cell phone, but Richardson did not return the phone calls.  (Binion Aff. ¶ 17.)

18.    On February 1, 2005, Richardson reported to work on the night shift, when no supervision or upper management were present.  (Richardson Dep. at 130-31; Vann Aff. ¶ 22.)  Because Richardson had failed to resolve the issues concerning her absence, return APPC's calls, or otherwise communicate with her supervisor or the human resources department, she was advised by security to return to human resources at 9 a.m. on February 2, 2005 to discuss the facts surrounding her latest absence and her continuing performance problems.  (Vann Aff. ¶ 22.)

19.    On February 2, 2005, Robert Vann, Steve Green, James Binion, John Newton and Evelyn Johnson met with Richardson about her continuing, unresolved performance problems.  (Vann Aff. ¶ 23; Binion Aff. ¶ 19.)  Following the meeting, the decision was made to terminate Richardson's employment because of her poor work ethic and continuing performance problems.  (Vann Aff. ¶ 23; Binion Aff. ¶ 19.)  On February 3, 2005, Richardson was informed of APPC's decision.  (Vann Aff. ¶ 23; Binion Aff. ¶ 19.)

20.    When Richardson applied for unemployment compensation benefits, she reported that she was discharged for "unsatisfactory work."  (Vann Aff. ¶ 24; Notice of Claim and Request for Separation Information, attached as Exhibit 9 to Vann Aff.)

21.    No other employee's negligence has resulted in a loss of more than a half million dollars to APPC.  (Vann Aff. ¶ 25.)  No other employee has been retained after

blatantly violating company rules within ninety days of receiving a "Last Chance Agreement." (Vann Aff. ¶ 25.) Richardson is the only APPC employee to ever receive a "Second Last Chance Agreement." (Vann Aff. ¶ 25.)

22.     After Richardson's employment was terminated, the two other employees on Richardson's shift, one black and one white, assumed Richardson's duties. (Vann Aff. ¶ 27; Binion Aff. ¶ 20.) Although Richardson has proffered the testimony of Steve Green that Jonathan Black, a Caucasian, "could have been" a replacement for Richardson, she has proffered no evidence to dispute that her duties were assumed by two employees after her termination and that one of those employees was African-American.

23.     On July 1, 2005, Richardson filed a Charge of Discrimination with the EEOC. In her Charge, Richardson alleges that she was terminated because of her race and in retaliation for her complaint regarding her supervisor's more favorable treatment of a white employee. (Def. Exh. E.) On December 20, 2005, the EEOC issued a Dismissal and Notice of Rights letter. (Dismissal and Notice of Rights letter, attached hereto as Exhibit F.) The EEOC was unable to conclude that Richardson's allegations established a violation of federal statutes. (*Id.*) However, pursuant to EEOC policy, Richardson was issued a right to sue letter.

24.     On March 17, 2006, Richardson filed the above-styled action. In her Complaint, Richardson asserts a claim of race discrimination under Title VII and 42 U.S.C. § 1981 based upon her termination.

**CONCLUSIONS OF LAW**

**A.     Standard of Review.**

The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. Rule. Civ. P. 56©); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).

When faced with a motion for summary judgment, the non-movant bears the burden of coming forward with sufficient evidence that proves every element of a claim on which such non-movant has the burden of proof. *See*, *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986); *Celotex*, 477 U.S. at 317. If the non-movant's response consists of nothing more than conclusory allegations, the court must enter summary judgment for the movant. *Peppers v. Coates*, 887 F.2d 1493 (11th Cir. 1989).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . . [o]nly factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment." *Lofton v. Secretary of Dep't of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004)(citations omitted). A fact is material if, under applicable substantive law, it might affect the outcome of the case. *Anderson*, 477 U.S. at

242. It is genuine if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).

A defendant moving for summary judgment is not required to disprove every element of the plaintiff's case to prevail. Instead, the defendant is required to demonstrate only that plaintiff will be unable to meet his or her burden of proof on any essential element of his or her claims. As Fed.R.Civ.P. 56 ©) points out, summary judgment should be granted when it becomes apparent that the plaintiff is unable to "make a showing sufficient to establish an element essential to that party' s case, and on which that party would bear the burden of proof at trial." *Andrews v. Trans Union Corp.*, 7 F. Supp. 2d 1056, 1064 (C.D. Cal. 1998) (*citing Celotex Corp. v. Catrett*, 477 U.S. at 322).

Even though claims of employment discrimination often present fact-intensive issues, "the summary judgment rule applies in job discrimination cases just as in other cases." *Chapman v. AI Transport*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc). The Eleventh Circuit has expressly rejected the notion that summary judgment cannot be used in employment discrimination cases because such cases may involve issues of motivation and intent. *See*, *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004).

**B.    Discriminatory Discharge Claim**

    **1.    Plaintiff Failed to Establish Prima Facie Case.**

A plaintiff claiming discriminatory discharge must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the job she held; (3) she was discharged or disciplined; and (4) plaintiff's former position was filled by someone outside her protected class or a similarly-situated employee not in plaintiff's class engaged in nearly identical conduct but avoided plaintiff's fate. *See Holifeld v. Reno*, 115 F.3d 1555,1561-62 (11th Cir. 1997). In this case, Richardson's claim fails because she cannot establish the fourth element of her prima facie case.

Although the prima facie requirements are not to be rigidly construed, the Eleventh Circuit has warned that courts cannot "ignore the failure to present evidence of discrimination." *Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989). The purpose of the prima facie case, particularly the fourth element, "is to identify 'actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion.' " *Hawkins*, 883 F.2d at 984 (quoting *Byrd v. Roadway Express, Inc.*, 687 F.2d 85, 86 (5th Cir. 1982)).

APPC's actions do not raise any inference of discrimination because Richardson was terminated for legitimate reasons and her duties were assumed by one black employee and one white employee. *See, e.g., Minton v. Am. Bankers Ins. Group, Inc.*, No. 02-12942, 2003 WL 21303330 at *1 (11th Cir. Feb.6, 2003) (affirming summary judgment for employer on ADEA claim that found employee was not replaced when coworker merely absorbed some of plaintiff's duties); *Juniel v. Park Forest-Chicago*

*Heights*, 46 Fed. Appx. 853, 856 (7th Cir. 2002) (black employee could not establish prima facie case of discrimination because his responsibilities were spread among a number of individuals, including one black and two white employees).  *See also Coaker v. Home Nursing Services, Inc.*, No. 95-0120,1996 WL 316739, at *17 (S.D. Ala. Feb. 5, 1996) ("If an incumbent employee assumes no additional benefits by performing another employee's duties, there is no indication of preferential treatment.").  "Without the underlying suggestion of an illegal preference for a nonminority, there can be no inference of discrimination." *Hawkins*, 883 F.2d. at 984.

     Nor has Richardson proffered evidence that a similarly-situated employee outside the protected class engaged in nearly identical conduct but was not terminated. The Eleventh Circuit has emphasized that "the comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples and oranges.'" *See Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting *Maniccia v. Brown*, 171 F.3d 1364, 1368-69 (11th Cir. 1999)).   In *Silvera*, the Court concluded that the employer's differing treatment of the two employees did not raise an inference of discrimination and reversed a jury verdict in favor of Silvera.

     Richardson has indeed alleged that APPC's treatment of Jill Hollinsworth ("Hollinsworth"), a white employee, supports of her claim of discrimination.[2]

---

[2] According to Richardson, Hollinsworth should be considered a proper comparator because she was once discovered dozing on the job by her supervisor and Hollinsworth abused

Hollinsworth, even by Richardson's own admission, is not a proper comparator because Hollinsworth was never the subject of a customer complaint that cost APPC more than a half a million dollars.  (Richardson Dep. at 156.)  In fact, unlike Richardson, Hollinsworth's performance was never the subject of any customer complaint.  (Vann Aff. ¶ 26.)  Furthermore, it is undisputed that Hollinsworth never required two "Last Chance Agreements," never continued to have the same performance issues after initiating a "Personal Improvement Plan," and never submitted a request for leave that was refuted by her own physician and left unexplained by Hollinsworth.  (Vann Aff. ¶ 26.)  In sum, because Richardson and Hollinsworth are not similarly situated in terms of the type, frequency, and severity of misconduct, Hollinsworth is not a proper comparator under the law of this Circuit.  Accordingly, because Richardson has failed to establish a prima facie case of discrimination while APPC has established that it is entitled to summary judgment in its favor.

### 2. Plaintiff Failed to Rebut Legitimate, Nondiscriminatory Reasons for Discharge

Even if the evidence of record could be said to support a prima facie case, Richardson has clearly failed to rebut the legitimate, nondiscriminatory reasons

---

phone privileges.  (Richardson Dep. at 149-153.)  Even accepting Richardson's claims as true, there is no evidence even as to those particular allegations that Hollinsworth's conduct was nearly identical to Plaintiff's conduct or occurred within a reasonable time proximity.  *See Silvera*, 244 F.3d at 1259 (discussing the requirements for a proper comparator).  Unlike Richardson, no evidence has been proffered that Hollinsworth, within weeks of receiving her supervisor's memorandum concerning excessive phone usage and less than ninety days after receiving a "Last Chance Agreement," spent three hours of one shift on personal calls.  (Vann Aff. ¶ 9 (noting no other employee has so egregiously violated phone use policy)).

articulated by APPC for her termination. The record clearly establishes that, after making an error that cost APPC more than a half million dollars, Richardson failed to appreciate the seriousness of her offense and to fulfill her plan for personal improvement. For the reasons stated above, Richardson has failed to refute the legitimacy of her subsequent counselings and reprimands for violations of company policy such as showing up late for work and abusing phone privileges. It is undisputed that no other employee has ever been offered a "Second Last Chance Agreement." Nor does Richardson even address, let alone dispute, that the final straw came when her doctor informed APPC that the medical leave she had requested by fax on January 20, 2005, was not necessary and when she chose not to contact APPC or return phone calls from APPC for more than a week after knowing that APPC had concerns about her absence.

To survive summary judgment, Richardson must demonstrate that the reasons proffered by APPC are pretext for discriminatory motive. As this Court has explained:

> Pretext means a dishonest explanation, a lie rather than an oddity or an error.' 'A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; **'pretext' means deceit used to cover one's tracks.**' 'On the issue of pretext, our only concern is the honesty of the employer's explanation. Thus, an employer's reasons can be "mistaken, ill considered or foolish," but so long as an employer honestly believes those reasons, pretext has not been shown.

*Ramige v. McNeil Nutritionals, Inc.*, No. 05-0101-BH-B, 2006 WL 2798774, *17 (S.D. Ala. Sept. 29, 2006) (Hand, J.) (quoting *Clay v. Holy Cross Hospital*, 253 F.3d 1000, 1005-06 (7th Cir. 2001)) (emphasis added in *Ramige*). APPC reasonably believed, based upon Richardson's performance between January 2004 and January 2005, that she was

not committed to her position, had not complied with her improvement plan, and would continue to have performance problems. Richardson has failed to demonstrate that APPC's belief, which formed the basis for the termination decision, was not honestly held. Consequently, APPC has established that it is entitled to summary judgment even if it could be said, which it cannot, that Richardson had established a prima facie claim of discrimination.

**C.     Retaliation Claim**

To establish a prima facie case of retaliation, a plaintiff must show (1) she engaged in statutorily protected expression, (2) she suffered an adverse employment action, and (3) a causal link exists between the adverse action and the protected expression. *See Wideman v. Wal- Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Hairston v. Gaineville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1994). Although a plaintiff may satisfy the element of causation "if [s]he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse action," under the law of this Circuit, the temporal proximity between the protected conduct and the adverse action must be "very close." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (internal quotations omitted) (reviewing grant of summary judgment in claim filed under the anti-retaliation provision of the Americans with Disabilities Act). "If there is a substantial delay between the protected expression and the adverse action [,] in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.* at 1220 (concluding

that three-month period between the protected activity and the adverse employment action was insufficient to establishing a *prima facie* case of retaliation).

Richardson's purported protected conduct occurred in June 2003 when she alleges that she accused her supervisor of treating a white employee more favorably. (Richardson Dep. at 170-73.)  The first alleged "adverse action" occurred in January 2004, seven months later, when Richardson was written up and suspended following a customer complaint that cost APPC more than a half million dollars.  (Richardson Dep. at 182.)  The substantial, seven month time lapse between any protected conduct and the alleged adverse actions is too great to constitute circumstantial evidence of causation. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001) (citing affirmatively several court of appeals decisions for the proposition that a three to four month gap is insufficient to establish the causal relation prong in a retaliation case); *Wascura v. City of South Miami,* 257 F.3d 1238, 1244-45 (11th Cir. 2001) (holding three and one-half month period between plaintiff's protected conduct and the adverse employment action was insufficient to establish a causal connection); *Keel v. U.S. Dept. of Air Force*, 256 F. Supp. 2d 1269, 1291 (M.D. Ala. 2003) ("Where, as here, more than seven months elapsed between the last of Plaintiff's protected conduct and the allegedly retaliatory action, the timing of the events does not constitute circumstantial evidence of

causation."). Accordingly, for this reason alone, Richardson's claim of retaliation (if one has even been properly pled)[3] fails as a matter of law.

Even if the Court ignored Richardson's failure to satisfy the causal relationship prong, Richardson has failed to refute the legitimate, non-retaliatory reasons for APPC's employment decisions. Although Richardson apparently believes that disciplinary action is not warranted for her half million dollar mistake in January 2004, the Court agrees that any reasonable employer would think otherwise and that there is no evidence that APPC's disciplinary actions with regard to the incident were based upon race. Indeed, Richardson concedes that she is not aware of any other individual who was the subject of a customer complaint of comparable seriousness. (Richardson Dep. at 156.) The subsequent disciplinary actions– writeups, a Second Last Chance Agreement, and Plaintiff's termination – were all set against the backdrop of this half million dollar error, Richardson's "Last Chance Agreement," and her deficiencies in implementing the proposed improvement plan. APPC has not retained any other employee who continued to have performance problems after receiving a "Last Chance Agreement" and an unprecedented "Second Last Chance Agreement." Additionally, it must again be stated

---

[3]In her complaint, Richardson merely asserts the following:

> Since February 2003 under the supervision of Steven Green Plaintiff has been harassed and given unwarranted disciplinary actions, and was subsequently terminated. Plaintiff complained to Green about being treated differently from a white employee who worked in the same department to no avail.

Complaint at ¶ 5. Such is, on its face, insufficient to constitute a claim for retaliation.

that Richardson does not dispute that the final straw came when her doctor informed APPC that the medical leave she had requested by fax on January 20, 2005, was not necessary and when she chose not to contact APPC or return phone calls from APPC for more than a week after knowing that APPC had concerns about her absence.[4]  APPC is thus clearly entitled to summary judgment on Richardson's retaliation claim.

## CONCLUSION AND ORDER

For the reasons stated above, the Court concludes that no material issues of fact exist and that APPC is entitled to summary judgment in its favor as to each of Richardson's claims.  It is therefore **ORDERED** that APPC's motion for summary judgment be and is hereby **GRANTED** and that **JUDGMENT** be entered in favor of the defendant, Alabama Pine Pulp Company, Inc., and against the plaintiff, Linda C. Richardson, the plaintiff to have and recover nothing of the defendant.  Costs are taxed against the plaintiff.

**DONE** this 21st day of June, 2007.

        s/ W. B. Hand
    SENIOR DISTRICT JUDGE

---

[4] To the extent Richardson argues that APPC's consideration of events occurring more than one year before her termination was inconsistent with company policy that an employee's disciplinary slate is wiped clean "[i]f an employee goes 12 months without an incident," her argument is specious. APPC's Employee Handbook makes clear that the policy only applies to disciplinary action taken for excessive absenteeism. (APPC Employee Handbook, Section 3, page 6.)  Moreover, the Court agrees that even if this policy applies to other disciplinary actions, Richardson proffered no evidence refuting the fact that she *never* went a full twelve months without being disciplined.  As such, Richardson's termination was not inconsistent with company policy.